**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| TRACY HALL, |
| Plaintiff, |
| v. |
| WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY, |
| Defendant. |

Civil Action No. 19-1800 (BAH)

Chief Judge Beryl A. Howell

## MEMORANDUM OPINION

Plaintiff Tracy Hall brings this employment discrimination lawsuit against her former employer, Washington Metropolitan Area Transit Authority ("WMATA"), to challenge WMATA's termination of her employment, failure to hire her as a Bus Scheduling System Specialist, and hostile work environment, Am. Compl. ¶¶ 66–112, ECF No. 13, as well as its failure to ensure that she received notice of her options for continuation coverage under its group health plan upon termination, *id.* ¶¶ 2, 113–19. These claims are based on plaintiff's allegations that she was terminated, not hired, and subject to a hostile work environment both because she had a disability of chronic migraines and in retaliation for protected activity she undertook in relation to that disability. *See id.* ¶¶ 1, 66–112. Her claims center on the alleged discriminatory animus of her direct supervisor, Rosalind Dewey ("Dewey"), who allegedly harassed her, and ultimately orchestrated her non-hiring and termination, out of bias against individuals with disabilities and in retaliation for plaintiff's reporting to Human Resources about her supervisor's bias and plaintiff's use of intermittent leave as a disability accommodation. *See id.* ¶¶ 24–56; Pl.'s Mem. Supp. Cross Mot. Partial Summ. J. & Opp'n Def.'s Mot. Summ. J. ("Pl.'s Mem.") at 6–14, ECF No. 17.

1

Defendant attributes plaintiff's termination and non-hiring solely to her poor job performance, and denies that plaintiff was subject to harassment that rose to the level of a hostile work environment.  Def.'s Mot. Summ. J. ("Def.'s Mot.") at 1–2, ECF No. 15.  Further contending that Eleventh Amendment sovereign immunity bars plaintiff's statutory notice claim, defendant moves for summary judgment as to Count VII on this ground.  *Id.* at 2.  Plaintiff cross-moves for partial summary judgment, arguing, first, that she is entitled to judgment that she had a disability as a matter of law and that defendant had notice of that disability and, second, that judgment should be entered in her favor as to her statutory notice claim because no dispute of material fact exists and sovereign immunity does not apply.  *See* Pl.'s Cross-Mot. Partial Summ. J. ("Pl.'s Mot.") at 1, ECF No. 16; Pl.'s Mem. at 5–15.  She otherwise asserts that genuine issues of material fact preclude summary judgment in defendant's favor.  *See* Pl.'s Mem. at 2, 6–14. For the reasons set forth below, both parties' motions are granted in part and denied in part.

## I.     BACKGROUND

### A.     Factual Background

Plaintiff was employed in defendant's IT Department for over a decade, from August 6, 2007 until November 28, 2018.  Pl.'s SMF ¶ 1, at 9 ¶ 47, ECF No. 17-1; Def.'s SMF ¶¶ 1, 23, ECF No. 15-1; Pl.'s Resp. SMF at 10, ECF No. 17-1.[1]  As a WMATA employee, plaintiff was represented in labor matters by Office and Professional Employees International Union Local No. 2, AFL-CIO ("Local 2").  Def.'s SMF ¶ 2; Pl.'s Resp. SMF at 10.  Plaintiff suffers from chronic migraines, which impact her daily functioning and therefore constitute a disability.  Pl.'s SMF ¶¶ 2, 3; Def.'s SMF ¶ 3; Pl.'s Mem., Ex. 7, Dep. of Tracy Hall ("Hall Dep.") 9:16–10:2,

---

[1]      In a section of her Statement of Material Facts Not in Dispute captioned "Plaintiff's Statement of Facts Precluding Summary Judgment," plaintiff restarts her numbering of paragraphs at one.  *See* Pl.'s SMF at 3–9.  To differentiate identically numbered paragraphs, paragraphs in this latter section of the Statement of Material Facts are cited by page and paragraph number.

ECF No. 17-8; Def.'s Mot., Ex. 1, Dep. of Tracy Hall ("Def.'s Hall Dep.") 9:16–10:2, ECF No.

15-2.  On July 27, 2012, defendant granted plaintiff several reasonable work accommodations for

her disability, including "modification of her working hours on days when she had afternoon

medical appointments and an enclosed workspace in a fragrance-free environment with special

[lighting]."  Def.'s SMF ¶ 4 (citing Def.'s Hall Dep. 10:3–12:10); *see also* Pl.'s Resp. SMF at

10; Def.'s Mot., Ex. 2, Letter from Amy-Celeste Quillen, WMATA Dep't of Hum. Res., to Tracy

Hall (July 27, 2012) ("Accommodation Letter") at 1–3, ECF No. 15-3.  At some point before

2017, plaintiff applied for, and was granted, intermittent leave pursuant to the Family and

Medical Leave Act ("FMLA"), Pub. L. No. 103-3, 107 Stat. 6, as a disability accommodation.[2]

### 1.    *Plaintiff's Interactions with Dewey*

On April 1, 2017, Dewey became plaintiff's direct supervisor.  Def.'s SMF ¶ 6; Pl.'s

Resp. SMF at 10.  Plaintiff testified that Dewey repeatedly said that she "didn't want

handicapped people working for her," Hall Dep. 18:13–14, and on multiple occasions told

plaintiff that she "needed to decide if [she] wanted to be sick or if [she] wanted to have a job," *id.*

19:3-4.  According to plaintiff, Dewey first made this comment soon after she became plaintiff's

supervisor, in a one-on-one meeting at which plaintiff informed Dewey of an upcoming day on

which plaintiff would need to utilize her medical leave.  *Id.* 19:9–20:5.  Plaintiff claims that she

reported Dewey's comment to WMATA's Employee Assistance Program, Office of Human

---

[2]      Plaintiff received her first written warning, for "excessive absences and inadequate performance," on April
3, 2013.  Def.'s Mot., Ex. 3, Memorandum from Brian Fisher, Supervisor, to Tracy Hall (Apr. 3, 2013) ("2013
Warning") at 1, ECF No. 15-4; *see also* Def.'s SMF ¶ 5; Pl.'s Resp. SMF at 10.  The warning advised plaintiff that
she could "explore exercising [her] rights under [the] FMLA" to allow her to access additional time off related to her
disability, 2013 Warning at 1, suggesting that she was not yet entitled to such leave.  Plaintiff contends that
"intermittent leave" was among the accommodations approved by defendant in 2012, Pl.'s SMF ¶ 4, or even earlier,
in 2010 or 2011, *see* Am. Compl. ¶¶ 22–23, and testified that she had intermittent FMLA leave "continuously the
entire time [she] worked for WMATA," Hall Dep. 29:21-22.  The 2012 letter granting plaintiff accommodations
makes no mention of intermittent leave.  *See* Accommodation Letter.  In any event, defendant does not dispute that
plaintiff was approved for intermittent FMLA leave as a disability accommodation at some point before the events
relevant to this case transpired.  Defendant appears to have required employees to undergo a recertification process
for continued FMLA eligibility either annually or at six-month intervals.  *See* Hall Dep. 30:8-21.

Resources ("Human Resources"), and Office of Civil Rights, and to Local 2. *Id.* 20:10-14, 20:18, 21:2, 21:17–22:15. Nonetheless, plaintiff says, Dewey repeated similar remarks in May or June 2017, around the same time plaintiff's absences first drew Dewey's attention. *Id.* 24:17-19, 27:11-17. At least twice, Dewey allegedly made derogatory remarks about plaintiff's disability within earshot of others, including a negative statement about plaintiff being "sick" made in front of plaintiff and a Local 2 official, *id.* 29:3-13, and the comment "I don't want handicapped people working around me," which was directed at plaintiff during a one-on-one conversation and was overheard by one of plaintiff's coworkers, *id.* 31:19–32:18. On the latter occasion, plaintiff "came out of [Dewey's] office crying." *Id.* 32:5. According to plaintiff, Dewey made such statements so frequently in her one-on-one encounters with plaintiff that plaintiff "can't account for every instance." *Id.* 33:15-16.

Plaintiff testified that she again reported Dewey's comments and conduct to Human Resources in October 2017. *Id.* 36:6–37:8. She believes that Human Resources "contacted" Dewey to discuss plaintiff's complaint, *id.* 37:6, after which Dewey "stopped saying handicapped and she started saying leave or sick" when commenting on plaintiff's use of her accommodations and her disability, *id.* 36:4-5.[3] Defendant, and Dewey herself, deny that Dewey made any such statements about "handicapped" persons. Def.'s Reply to Pl.'s Cross-Mot. Partial Summ. J. & Opp'n to Def.'s Mot. Summ. J. ("Def's Reply") at 2, ECF No. 18 (citing Pl.'s Mem., Ex. 1, Dep. of Rosalind Dewey ("Dewey Dep.") 83:13-21, ECF No. 17-2). Dewey's derogatory comments allegedly continued undeterred. In a specific November 2017 incident described by

---

[3] Plaintiff testified that she was not told how to initiate a formal complaint against Dewey and "WMATA did not investigate" her informal report. Pl.'s SMF at 5 ¶ 17; *see also* Hall Dep. 22:8-15, 64:9-13. Plaintiff also alleges that, when she first brought her concerns to WMATA's Office of Civil Rights, the WMATA entity charged with implementing defendant's obligations under applicable antidiscrimination laws, she was advised to seek "a job in another department" because "once people start having issues, especially with medical" and disability accommodations, "they . . . keep trying until they got [sic] what they wanted." Hall Dep. 22:10-15.

plaintiff, Dewey came into plaintiff's office and began yelling at plaintiff about work-related matters until plaintiff began to cry.  Hall Dep. 70:10–71:17; Def.'s Mot., Ex. 18, Pl.'s Resp. to Def.'s Interrog. ("Interrog. Resp.") No. 8, ECF No. 15-19.  According to plaintiff, such interactions, involving Dewey "yelling" at plaintiff about her "being out or work things," Hall Dep. 72:8, 72:10-11, so harshly that plaintiff would sometimes be left in tears, *see, e.g.*, *id.* 71, were routine.  Dewey's berating made plaintiff "so nervous when coming into the office that [she] would throw up and would have to go to the bathroom often."  Interrog. Resp. No. 8.

Beyond Dewey's alleged comments, plaintiff claims that Dewey took several adverse actions against plaintiff in 2018 because of her disability and use of intermittent leave as an accommodation.  First, according to plaintiff, Dewey "prevented [her] from attending a required [off-site] work training" on time entry "because of [her] disability related absences."  Pl.'s Mem. at 3 (citing Pl.'s SMF at 6 ¶ 23); *see also* Hall Dep. 46:3–48:21; Interrog. Resp. No. 7.

Second, Dewey allegedly deprived plaintiff of the ability to participate in voluntary workplace opportunities.  Specifically, according to plaintiff, Dewey removed plaintiff from the Family Assistance Team (described by defendant as "a voluntary team [of WMATA employees] that assisted passengers during a catastrophic emergency," Def.'s Mem. P. & A. Supp. Mot. Summ. J. ("Def.'s Mem.") at 6, ECF No. 15), Hall Dep. 49:3–50:15, denied her request to volunteer to assist passengers as part of WMATA's Metro Information Program ("MIP"), *id.* 50:17–51:10, and did not allow plaintiff to take a sign language class, *id.* 52:2–53:7, all because plaintiff "had too many FMLA days"—that is, disability-related absences, *id.* 50:12, 53:8-13, 54:2-11.  Defendant does not contest that Dewey rejected these requests by plaintiff, but notes that her ability to participate in these programs "was at her manager's discretion," Def.'s Mem. at 6, and that these opportunities were "not part of her job duties," *id.* at 7.

Finally, plaintiff claims that Dewey denied her permission to telework as a disability accommodation, although other employees in the IT department were allowed to telework, "on the grounds that employees who had taken more than six consecutive days of FMLA [leave] were not permitted to telework."  Pl.'s Mem. at 3 (citing Pl.'s SMF at 3 ¶ 3); *see also* Hall Dep. 42:12–44:17.  Plaintiff testified that her coworkers referred to this policy as "the Tracy Rule," because it applied only to plaintiff.  *Id.* 42:15-17.  When asked for the source of this rule, Dewey allegedly told plaintiff that it was "at [Dewey's] discretion."  *Id.* 43:22–44:1.  Dewey herself testified that plaintiff did not approach her about teleworking, Dewey Dep. 16:9-13, but that, at the time, WMATA left to "the supervisor's discretion [the decision] to allow [or prohibit] teleworking because at the time they didn't have a policy in place," *id.* 16:16-18.

In the meantime, according to plaintiff, Dewey's derogatory remarks about "handicapped" or "sick" people continued.  On November 21, 2017, six months after her initial complaints to Human Resources, plaintiff sent an email to WMATA's Office of Employee Relations, requesting a mediation between herself and Dewey.  Def.'s Mot., Ex. 10, Email from Tracy Hall to Michelle R. Chapman & Brenda E. Creaville (Nov. 21, 2017) at 1, ECF No. 15-11. In the email, plaintiff reported, "I am constantly feeling as if I am being degraded [and] talked to in a disrespectful manner.  I have attempted on numerous occasions to talk to [Dewey] and let her know how intimidating this is to me and it only appears to get worse."  *Id.*  Plaintiff testified that she also approached Robert "Dutch" Dunham, an upper-level manager who supervised Dewey, in January 2018 "to try to get assistance" in addressing Dewey, Hall Dep. 101:12-18, and returned to Human Resources the same month, *id*. 65:2.  A mediation was eventually scheduled for March 2018.  *Id*. 65:2-6.  The mediation took place in March 2018, and, according to plaintiff, centered on her allegations that Dewey was creating a "hostile work environment"

and that plaintiff "felt like [she] was being discriminated against."  Hall Dep. 65:22-66:14; *see also id.* 66:15–67:13; Def.'s Mem. at 6.  In particular, plaintiff "discussed how [Dewey] would make references to [plaintiff] having FMLA [and] to [plaintiff] being handicapped."  Hall Dep. 67:10-13.  She testified that the March 2018 mediation resulted in "a consensus" between herself and Dewey.  *Id.* 70:1.

### 2.   *Disciplinary Warnings Against Plaintiff*

The fraught relationship between plaintiff and Dewey was punctuated by a series of formal notices, interventions, and evaluations.  In the first of these interactions, on August 9, 2017, plaintiff received her first written warning since 2013 from Dewey, for excessive absences. Def.'s SMF ¶ 7; Pl.'s Resp. SMF at 10; Def.'s Mot., Ex. 5, Memorandum from Rosalind P. Dewey, Supervisor, IT Applications & Dev., to Tracy Hall (Aug. 9, 2017) ("Excessive Absences Warning") at 1, ECF No. 15-6.  The warning cautioned plaintiff that "[s]ince being transferred under [Dewey's] leadership beginning April 1, 2017, [her] attendance has been unacceptable" and reminded her of the requirement that she provide three days' notice for absences related to medical appointments.  Excessive Absences Warning at 1.  Plaintiff filed a grievance through Local 2 seeking to rescind this warning.  On September 22, 2017, Dewey denied the grievance at the Step One level because, she claimed, plaintiff "did not have an approved FMLA certification" from "October 1, 2016 through April 20, 2017."  Def.'s Mot., Ex. 7, Memorandum from Rosalind P. Dewey, Supervisor, IT Applications & Dev., to Bryant K. McClary, Local 2 Shop Steward (Sept. 22, 2017), at 1, ECF No. 15-8; *see also* Def.'s SMF ¶ 9; Pl.'s Resp. SMF at 10.  Notwithstanding Dewey's assessment, the Excessive Absences Warning specifically referred to plaintiff's absences since April 1, 2017.  *See* Excessive Absences Warning at 1.  Dewey's own record of plaintiff's absences from April 1, 2017 until the date of the Excessive Absences Warning indicate that plaintiff's absences were, with one exception, all related to her disability,

Pl.'s Mem., Ex. 4, Excel Sick Report ("Sick Report") at 5–7, ECF No. 17-5, and that plaintiff was approved for intermittent FMLA leave from April 29, 2017 to October 29, 2017, subject to a three days' notice requirement for medical appointments, *id.* at 6.

On October 9, 2017, Dewey issued a second written warning against plaintiff.  This warning followed a complaint from a coworker and investigation, which revealed that plaintiff had cooking equipment and a space heater, which had been left on, in her work area.  Def.'s Mot., Ex. 8, Memorandum from Rosalind P. Dewey, Supervisor, IT Applications & Dev., to Tracy Hall (Oct. 10, 2017) ("Safety Violations Warning") at 1, ECF No. 15-9.  Dewey initially gave plaintiff a verbal warning and issued the written warning after finding the space heater on again.  *Id.* at 2.  Though plaintiff attempted to challenge this warning through Local 2, after a meeting attended by Dewey and plaintiff, a union representative concluded that Dewey had followed "[p]roper procedure" in issuing the warning and that "the Union [did] not have solid ground to pursue a grievance" on plaintiff's behalf.  Def.'s Mot., Ex. 9, Memorandum from Aris Papapetrou, Local 2 Shop Steward (Oct. 20, 2017), ECF No. 15-10.

### 3.  *Plaintiff's 2018 Performance Evaluation and Performance Improvement Plan*

On February 6, 2018, approximately one month before the March 2018 mediation between plaintiff and Dewey, Dewey issued plaintiff's mid-year performance review for the August 2017–August 2018 evaluation year.  Def.'s SMF ¶ 13; Pl.'s Resp. SMF at 10.  The review indicated concerns with plaintiff's job performance and workplace behavior, concluding that plaintiff was "not meeting department performance standards."  Def.'s Mot., Ex. 11, WMATA Performance Management Evaluation Form for Tracy Hall (2018) ("2018 Evaluation") at 11, ECF No. 15-12; *see also id.* at 7–11 (Mid-Year Conversation).

On August 8, 2018, Dewey issued, and plaintiff's second-level supervisor approved, plaintiff's 2018 End-of-Year performance evaluation. 2018 Evaluation at 22; Def.'s SMF ¶ 15; Pl.'s Resp. SMF at 10, 11. The evaluation showed that plaintiff had achieved under seventy percent of her objectives for the 2018 evaluation year, 2018 Evaluation at 12–22, resulting in an overall rating of "Needs Improvement," and was therefore required to complete a Performance Improvement Plan ("PIP"), *id.* at 21. On August 14, 2018, plaintiff was accordingly placed on a PIP that outlined five objectives to be achieved during an eight-week review period. Def.'s Mot., Ex. 12, WMATA Performance Improvement Plan for Tracy Hall at 1 ("PIP"), ECF No. 15-13; Def.'s SMF ¶ 16; Pl.'s Resp. SMF at 10. The PIP had a scheduled end date of October 2, 2018, and stated that plaintiff's "[f]ailure to satisfactorily meet the requirements established in the PIP" by that date would "result in disciplinary action, up to and including termination." PIP at 5. Plaintiff disputes the accuracy and validity of the 2018 evaluation, as she claims that "[a]ll of the objectives" the evaluation shows she "failed to meet" required her to use HASTUS, an internal system that, she alleges, she was unable to utilize because her access "had been removed by [a coworker] at the instruction of Ms. Dewey." Pl.'s Resp. SMF at 11 (citing Hall Dep. 73).

Plaintiff, through Local 2, filed a grievance contesting her evaluation and the PIP, which Dewey denied on August 20, 2018. Def.'s Mot., Ex. 13, Memorandum from Rosalind P. Dewey, Supervisor, IT Applications & Dev., to Myron J. Long, Local 2 Shop Steward (Aug. 20, 2018), ECF No. 15-14; Def.'s SMF ¶ 18; Pl.'s Resp. SMF at 10. Local 2 escalated the grievance, and on August 27, 2018, a Step Two grievance meeting occurred between plaintiff, Dunham, and Local 2 officials. Def.'s Mot., Ex. 14, Response to Stage 2 Grievance Filed by Tracy Douglas (Sept. 24, 2018) ("Grievance Response") at 2, ECF No. 15-15; Def.'s SMF ¶ 19; Pl.'s Resp. SMF at 10. The investigation that followed this meeting concluded that plaintiff's "account of

instructions given by Dewey [regarding plaintiff's HASTUS access] is inaccurate." Grievance Response at 6. Nonetheless, to resolve the grievance, defendant agreed to modify the evaluation to reflect that plaintiff had met one additional objective and satisfied two additional criteria. *Id.* at 8. The "net effect of these changes" did not alter plaintiff's overall "Needs Improvement" rating, and so the PIP remained in place. *Id.* To account for the weeks during which plaintiff's grievance was pending, the end date of the PIP was modified to November 6, 2018, giving plaintiff an additional four weeks to meet the PIP objectives. PIP at 5.

At the close of plaintiff's PIP period, on November 6, 2018, Dewey stated in a memorandum to Human Resources that plaintiff had satisfied only two of the five PIP objectives. Def.'s Mot., Ex. 15, Memorandum from Rosalind P. Dewey, Supervisor, IT Applications & Dev., to Brenda Creaville (Nov. 9, 2018) ("PIP Memo") at 1, ECF No. 15-16; Def.'s SMF ¶ 21; Pl.'s Resp. SMF at 10; *see also* PIP Memo at 3–9 (Final Summary of PIP for Tracy Hall). According to plaintiff, the three objectives she failed to meet "required access to . . . HASTUS," Pl.'s SMF at 6 ¶ 29, the internal system plaintiff alleges she was unable to use because Dewey directed a coworker to remove plaintiff's access, *see id.* at 7 ¶¶ 30, 32 (citing Hall Dep. 72–73).

### 4. *The Bus Scheduling System Specialist Position*

In May 2018, after her February 2018 mid-year performance evaluation and the March 2018 mediation, plaintiff applied for a position within WMATA, but outside Dewey's chain of command, as a Bus Scheduling System Specialist. Def.'s SMF ¶ 14; Pl.'s Resp. SMF at 10. While her PIP was in progress, plaintiff's application for the Bus Scheduling System Specialist position proceeded. The parties agree that plaintiff was under consideration for that position during this time, Def.'s Mem. at 10; Pl.'s SMF at 7 ¶¶ 33–36, but disagree as to the details of the hiring process. Plaintiff alleges that she interviewed with a panel for the position, Pl.'s SMF at 7

¶ 34 (citing Hall Dep. 80), informed the panel members that she was on a PIP, *id.* at 7 ¶ 35 (citing Compl. ¶ 40, ECF No. 1), and was nonetheless invited for a second interview, *id.* at 7 ¶ 36 (citing Compl. ¶ 41).  She claims that she received a verbal offer, and was told that she would receive a written offer letter after a Human Resources representative spoke with Dewey about a release date for plaintiff.  Pl.'s SMF at 7 ¶ 38 (citing Hall Dep. 80–82).  Dewey's testimony, in which she recalls being told by a Human Resources officer that "they were going to offer Tracy the position," Dewey Dep. 46:7-9, and to expect a request for a release date, *id.* 46:13-16, corroborates this account.  In contrast, defendant alleges that, though plaintiff was under consideration, she was never selected for the position.  *See, e.g.*, Def.'s Mem. at 11 (referring to plaintiff's "non-selection for the position"); Def.'s Mot., Ex. 16, Email from Robert "Dutch" Dunham, Chief, Off. of Applications Dev. & Operations, to Leonte McDaniel, Thomas M. Webb, Myron J. Long, & Edith M. Lowden (Nov. 19, 2018) ("Dunham Email") at 1, ECF No. 15-17 (describing "discussion of [plaintiff's] application for a position in Bus Scheduling").

At some point, the parties agree, the issue of plaintiff's PIP entered the hiring process. Plaintiff, as noted, claims that she raised the PIP early in the process and that, even after disclosing the PIP, she remained under consideration.  According to Dewey, while the PIP was in progress, she became aware of plaintiff's potential transfer and approached Dunham, her "supervisor's manager," to "seek advice on" the process to notify Human Resources that plaintiff was on a PIP, apparently assuming that the hiring panel was unaware of the continuing issues with plaintiff's performance.  Dewey Dep. 43:2-17.  The process undisputedly went awry for plaintiff after Dewey approached Dunham and Human Resources with her concerns about plaintiff's performance.

The parties concur that, after Dewey's intervention and after she reported to Human Resources that plaintiff had not successfully completed the PIP, Dunham attended a meeting with representatives of WMATA's Employee Relations and Labor Relations departments about plaintiff.  Pl.'s SMF at 8 ¶ 41; Dewey Dep. 48:8-21; *see* Dunham Email at 1.  At that meeting, "[t]here was discussion of [p]laintiff's application for a position in Bus Scheduling."  Dunham Email at 1.  According to plaintiff, the meeting resulted in a management-level decision that plaintiff "should not be allowed to transfer while currently on a PIP," which decision was communicated to the hiring manager for the Bus Scheduling System Specialist position.  Pl.'s Resp. SMF at 12 (first citing Hall Dep. 82–83; and then citing Dewey Dep. 48).  Defendant contends that the meeting instead led to a conversation about plaintiff with the hiring manager for the position, during which the hiring manager himself "confirmed that he [was] not willing to hire an individual with the performance record of [plaintiff]."  Dunham Email at 1; *see also* Def.'s Mem. at 10.  Regardless, plaintiff was not hired for the job, and asserts that, though defendant now argues that her non-hiring was the result of her ongoing PIP, defendant had no written policy preventing the transfer or hiring of employees on a PIP and created and applied this rule to her application.  Pl.'s Mem. at 4; Pl.'s SMF at 8 ¶ 43 (citing Dewey Dep. 49).

As of November 19, 2018, plaintiff was removed from consideration for the Bus Scheduling System Specialist position.  Def.'s SMF ¶ 22.  The parties also contest the nature of that removal.  Plaintiff claims that her pending verbal "offer was rescinded," Pl.'s Mem. at 4; *see also* Dewey Dep. 48:20, and that she was told the position "had been eliminated," Pl.'s SMF at 8 ¶ 44 (citing Compl. ¶ 49).  Defendant, in contrast, alleges that her "pending application" for the position was "withdrawn."  Def.'s Mem. at 7.  Around the same time, defendant posted an opening for a Bus Operations Specialist on its online employment portal.  Pl.'s SMF at 8 ¶ 45

(citing Compl. ¶ 51); Pl.'s Mem., Ex. 5, Email from WMATA to Tracy Hall (Nov. 29, 2018)

("Application Email") at 1, ECF No. 17-6.  According to plaintiff, this job was the Bus

Scheduling System Specialist position, "reposted . . . under a slightly modified title."  Pl.'s SMF

at 8 ¶ 45.  Plaintiff submitted an application for the new opening on November 29, 2018 (the day

after her termination), Application Email at 1, but was not invited to interview for the position,

Pl.'s Mem., Ex. 6, Email from WMATA to Tracy Hall (Dec. 4, 2018) at 1, ECF No. 17-7.

### 5.     *Plaintiff's Termination*

In her November 6, 2018 memorandum to Human Resources stating that plaintiff had not

met three of the five objectives in her PIP, Dewey "request[ed] separation from employment

based on Ms. Hall's failure to meet the conditions of the Performance Improvement Plan."  PIP

Memo at 1.  Accordingly, on November 28, 2018, plaintiff's employment with defendant was

terminated.  Def.'s Mot., Ex. 17, Letter from Rosalind P. Dewey, Supervisor, IT Applications &

Dev., to Tracy Hall (Nov. 28, 2018) ("Termination Letter") at 1, ECF No. 15-18; Def.'s SMF

¶ 23; Pl.'s Resp. SMF at 10.  In a letter to plaintiff, Dewey explained that plaintiff was being

terminated because of her "failure to meet all the conditions of the Performance Improvement

Plan and [her] prior record," namely, the Excessive Absences Warning, the Safety Violations

Warning, and the August 2018 performance evaluation.  Termination Letter at 1.  Plaintiff claims

that, upon her termination, she received no documentation from defendant other than the

Termination Letter, Pl.'s SMF ¶ 7, including "any form of COBRA notice" informing her of her

right to elect continuation coverage through defendant's group health plan after termination, *id.*

¶ 12.

### B.     Procedural History

Seven months after her termination, on June 20, 2019, plaintiff initiated this lawsuit,

bringing claims for unlawful discrimination and retaliation in violation of the Rehabilitation Act

of 1973 ("Rehabilitation Act"), 29 U.S.C. § 701 *et seq*.  *See* Compl.  On February 6, 2020, she

filed an Amended Complaint, alleging seven counts against defendant.  *See* Am. Compl.  Six of

those counts allege violations of the Rehabilitation Act: first, that defendant intentionally

discriminated against her because of her disability when it failed to hire her as a Bus Scheduling

System Specialist (Count I, *id*. ¶¶ 66–75); second, that defendant failed to hire her for said

position in retaliation for the March 2018 mediation between plaintiff and Dewey (Count II, *id*.

¶¶ 76–84); third, that defendant intentionally discriminated against her because of her disability

when it terminated her employment (Count III, *id*. ¶¶ 85–91); fourth, that said termination was in

retaliation for the March 2018 mediation (Count IV, *id*. ¶¶ 92–97); fifth, that plaintiff was

subject to a hostile work environment because of her disability (Count V, *id*. ¶¶ 98–105); and

sixth, that plaintiff was subject to a hostile work environment in retaliation for her complaints

about Dewey to Human Resources and her use of intermittent leave as a reasonable

accommodation for her disability (Count VI, *id*. ¶¶ 106–12).  The seventh count alleges that

defendant failed to provide plaintiff with a notice of her right to continued health insurance

coverage under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), Pub.

L. No. 99-272, 100 Stat. 82, as applied to state and local government employers through

provisions of the Public Health Service Act ("PHSA"), 42 U.S.C. §§ 300bb-1 to 300bb-8 (Count

VII).  Am. Compl. ¶¶ 113–19.  The Amended Complaint seeks reinstatement or front pay, back

pay, compensatory damages, attorneys' fees and costs, "[a]ppropriate equitable relief pursuant to

42 U.S.C. § 300bb-7, including surcharge, as defined by the Supreme Court in *CIGNA v. Amara*,

563 U.S. 4[2]1 (2011)," punitive damages, and "[o]ther such relief as may be appropriate to

effectuate the purposes of the Rehab Act."  *Id.* at 11–12.

14

In response to defendant's motion for summary judgment as to all counts in the Amended Complaint, *see* Def.'s Mot. at 1–2, plaintiff both opposes that motion and has cross-moved for partial summary judgment as to Count VII and the findings, relevant to Counts I, III, and V of the Amended Complaint, "that [plaintiff] has a disability as a matter of law and [defendant] had notice of [p]laintiff's disability," Pl.'s Mot. at 1.  These motions are now ripe for resolution.

## II.   LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, "[a] party is entitled to summary judgment only if there is no genuine issue of material fact and judgment in the movant's favor is proper as a matter of law." *Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1267 (D.C. Cir. 2018) (quoting *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 805 (D.C. Cir. 2006)); *see also* Fed. R. Civ. P. 56(a).  Summary judgment may be granted on a "claim or defense . . . or [a] part of [a] claim or defense."  Fed. R. Civ. P. 56(a); *see also* Fed. R. Civ. P. 56(a) advisory committee's note to 2010 amendment ("[S]ummary judgment may be requested not only as to an entire case but also as to a claim, defense, or part of a claim or defense.").

In determining whether a genuine dispute as to any material fact exists, the court must "view[] the evidence in the light most favorable to the non-movant." *Baylor v. Mitchell Rubenstein & Assocs., P.C.*, 857 F.3d 939, 952 (D.C. Cir. 2017) (quoting *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1113 (D.C. Cir. 2016)).  Where, as here, cross-motions for summary judgment are considered, "both parties" must be accorded "the solicitude owed non-movants," assessing the evidence in the light most favorable to each.  *Id.*  In conducting this analysis, the record must be "taken as a whole." *Lopez v. Council on Am.-Islamic Rels. Action Network, Inc.*, 826 F.3d 492, 496 (D.C. Cir. 2016).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotation marks

omitted) (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)); *see also*

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) ("[A]t the summary judgment stage[,]

the judge's function is not himself to weigh the evidence and determine the truth of the matter

but to determine whether there is a genuine issue for trial.").

## III.   DISCUSSION

Defendant argues that it is entitled to summary judgment in its favor on all seven of

plaintiff's claims.  *See* Def.'s Mot. at 1–2.  Six of those claims are brought under section 504 of

the Rehabilitation Act, which provides in relevant part that "[n]o otherwise qualified individual

with a disability in the United States . . . shall, solely by reason of her or his disability . . . be

subjected to discrimination under any program or activity receiving Federal financial assistance,"

including in their employment by such a program or activity.  29 U.S.C. § 794(a).  The

Rehabilitation Act adopts the Americans with Disabilities Act ("ADA")'s legal standards for

employment discrimination claims.  *See* 29 U.S.C. § 794(d).  Thus, like the ADA, the statute

bans multiple types of discrimination on the basis of disability, including intentional

discrimination and the creation of a hostile work environment, *see, e.g.*, *Baloch v. Kempthorne*,

550 F.3d 1191, 1196, 1201 (D.C. Cir. 2008); *Drasek v. Burwell*, 121 F. Supp. 3d 143, 153–54

(D.D.C. 2015) (first citing *Doak v. Johnson*, 19 F. Supp. 3d 259, 271 (D.D.C. 2014); and then

citing *Floyd v. Lee*, 968 F. Supp. 2d 308, 328–29 (D.D.C. 2013)), as well as retaliation "for

engaging in activities to preserve or enforce one's rights under the Act," *Kersey v. Wash. Metro.*

*Area Transit Auth.*, 533 F. Supp. 2d 181, 189 (D.D.C. 2008), *aff'd*, 586 F.3d 13 (D.C. Cir. 2009)

(citing *Duncan v. Wash. Metro. Area Transit Auth.*, 214 F.R.D. 43, 49–50 (D.D.C. 2003)); *see*

*also Smith v. District of Columbia*, 430 F.3d 450, 454–55 (D.C. Cir. 2005).  Plaintiff alleges two

claims in each of these categories for intentional discrimination, hostile work environment, and retaliation. Am. Compl. ¶¶ 66–112 (Counts I–VI). She moves for partial summary judgment as to the findings that she has a disability as a matter law and that defendant had notice of said disability, *see* Pl.'s Mot. at 1, but otherwise contends that genuine issues of material fact precluding summary judgment exist as to all six counts, *see* Pl.'s Mem. at 2, 6–14.

The last of plaintiff's claims asserts that defendant failed to provide notice of her right to continued group health coverage after her termination, as required by the COBRA provisions of the PHSA (Count VII). Am. Compl. ¶¶ 113–19. Both parties seek summary judgment in their favor as to this claim. *See* Pl.'s Mot. at 1; Def.'s Mot. at 2. Plaintiff's six Rehabilitation Act claims are discussed first, followed by examination of her statutory notice claim.

### A.      Rehabilitation Act Claims

Defendants moves for summary judgment in its favor as to plaintiff's claims for intentional discrimination, retaliation, and hostile work environment in violation of the Rehabilitation Act. In response to the intentional discrimination and retaliation claims, defendant argues that plaintiff's poor job performance is the legitimate, nondiscriminatory, and nonretaliatory reason for plaintiff not being hired as a Bus Scheduling System Specialist and for her termination. Def.'s Mem. at 9–13. With respect to the hostile work environment claims, defendant contends that the alleged harassment to which plaintiff was subjected was not so "severe or pervasive that it altered the conditions of [her] employment." *Id.* at 13. Plaintiff counters that disputes of material fact exist as to all six claims, such that defendant is not entitled to judgment as a matter of law. Pl.'s Mem. at 6–14. She does not seek summary judgment in her favor on these claims, but instead cross-moves only for "partial judgment that [she] has a disability as a matter of law and [d]efendant had notice of [her] disability." *Id.* at 1. For the

reasons set forth below, plaintiff is entitled to summary judgment that she has a disability as a matter of law, while defendant is entitled to summary judgment on plaintiff's retaliation claims. Plaintiff's intentional discrimination and hostile work environment claims present genuine issues of material fact not fit for resolution at summary judgment; summary judgment with respect to those claims is therefore denied.

### 1.   *Plaintiff's Disability and Defendant's Knowledge of Her Disability*

Plaintiff moves for partial summary judgment that she "has a disability as a matter of law" and that defendant "had notice of her disability," findings that are, she says, elements of Counts I, III, and V of her Amended Complaint and are therefore eligible for partial summary judgment under Federal Rule of Civil Procedure 56(a). Pl.'s Mot. at 1. Claims for intentional discrimination under the Rehabilitation Act require a plaintiff to show that she "has a 'disability' as defined in the ADA," *Alexander v. Wash. Metro. Area Transit Auth.*, 826 F.3d 544, 547 (D.C. Cir. 2016) (citing 29 U.S.C. §§ 705(9), 705(20)(B)), while hostile work environment claims require a plaintiff to show that "[s]he is a member of a protected class, in this case a 'qualified individual with a disability,'" *Pantazes v. Jackson*, 366 F. Supp. 2d 57, 71 (D.D.C. 2005) (citing *Lester v. Natsios*, 290 F. Supp. 2d 11, 22 (D.D.C. 2003)). Plaintiff contends that she "suffers from chronic migraines." Pl.'s SMF ¶ 2 (citing Hall Dep. 9–10). Defendant acknowledged her disability during her tenure as a WMATA employee and agreed to provide reasonable accommodations for it, *see* Accommodation Letter at 1–3, and concedes in its briefing "that [p]laintiff has a disability—chronic migraines," Def.'s Reply at 1 (citing Def.'s SMF ¶¶ 3–4). No genuine issue of material fact exists as to plaintiff's disability. Partial summary judgment that plaintiff has a disability as a matter of law is therefore granted.

Plaintiff also requests summary judgment as to the fact that defendant "had notice of [her] disability." Pl.'s Mot. at 1. This finding would be relevant to a failure to accommodate

claim under the Rehabilitation Act, *see, e.g.*, *Menoken v. Dhillon*, No. 18-5284, 2020 WL 5521676, at *4 (D.C. Cir. Sept. 15, 2020), but is not an element of the claims plaintiff has brought, for intentional discrimination and hostile work environment.  Federal Rule of Civil Procedure 56 does not provide for partial summary judgment as to facts that are not "part of [a] claim," and plaintiff's motion is therefore denied as to defendant's notice of her disability.

### 2.    *Intentional Discrimination and Retaliation Claims*

Defendant argues that it is entitled to summary judgment on plaintiff's intentional discrimination and retaliation claims because plaintiff "cannot prove a causal connection" between her disability or her protected activity and defendant's decisions not to hire her as a Bus Scheduling System Specialist or to terminate her employment.  Def.'s Mem. at 11; *see also id.* at 9–10, 11–12.  It cites plaintiff's "poor performance record" as the true reason for plaintiff's non-hiring and termination.  *Id.* at 10.  Plaintiff contends that this justification for defendant's actions is in fact pretextual, and that a reasonable jury could readily conclude that her termination and non-selection resulted from discrimination or retaliation.  Pl.'s Mem. at 6, 9, 11.

A Rehabilitation Act plaintiff bears the initial burden of making out a prima facie case of discrimination or retaliation, but, once the employer proffers "'a legitimate, nondiscriminatory [or nonretaliatory] reason' for its actions[,] . . . 'the sole remaining issue [is] discrimination [or retaliation] *vel non*."  *Kersey v. Wash. Metro. Area Transit Auth.*, 586 F.3d 13, 16 (D.C. Cir. 2009) (alterations in original) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142–43 (2000)).  At that stage, in resolving an employer's motion for summary judgment, "the court must decide one ultimate question: 'Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory [or nonretaliatory] reason was not the actual reason and that the employer intentionally discriminated [or retaliated] against

the employee . . . ?"  *DeJesus v. WP Co.*, 841 F.3d 527, 532–33 (D.C. Cir. 2016) (omission in

original) (quoting *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008)).

Defendant argues that plaintiff cannot survive summary judgment because she fails to

meet the Rehabilitation Act's rigorous but-for causation standard.  Def.'s Mem. at 9–10, 11–12.

The Rehabilitation Act prohibits discrimination against an employee "*solely* by reason of her or

his disability."  29 U.S.C. § 794(a) (emphasis added).  As a result, a Rehabilitation Act plaintiff

bringing intentional discrimination or retaliation claims must satisfy "the traditional 'but-for'

causation standard," *Drasek*, 121 F. Supp. 3d at 154 (citing *Gard v. U.S. Dep't of Educ.*, 752 F.

Supp. 2d 30, 35–36 (D.D.C. 2010), *aff'd*, No. 11-5020, 2011 WL 2148585 (D.C. Cir. May 25,

2011) (per curiam)), under which her disability or protected activity must be "the 'reason' that

the employer decided to act," *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009) (citing

*Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993)) (describing but-for causation in the

context of the Age Discrimination in Employment Act of 1967); *see also Bostock v. Clayton

County*, 140 S. Ct. 1731, 1739 (2020) (explaining that Congress uses "solely" in

antidiscrimination statutes "to indicate that actions taken 'because of' the confluence of multiple

factors do not violate the law"); *Gard*, 752 F. Supp. 2d at 36 (concluding that, to survive

summary judgment on Rehabilitation Act retaliation claim, plaintiff must show that "a

reasonable jury could conclude that 'but for' his [protected activity], Defendants would not have

made it more difficult to obtain a reasonable accommodation").

Plaintiff, as the non-movant with respect to her intentional discrimination and retaliation

claims, need not prove causation at summary judgment.  Rather, to survive defendant's motion,

she need only show that "a reasonable jury could infer discrimination or retaliation from 'all the

evidence, which includes not only the prima facie case but also the evidence the plaintiff offers

to attack the employer's proffered explanation for its action and [any] other evidence.'" *Morris v. McCarthy*, 825 F.3d 658, 668 (D.C. Cir. 2016) (alteration in original) (quoting *Gaujacq v. EDF, Inc.*, 601 F.3d 565, 577 (D.C. Cir. 2010)); *see also Kersey*, 586 F.3d at 17.  While "evidence of pretext is not *per se* sufficient to permit an inference of discrimination [or retaliation], it '[u]sually . . . will be enough to get a plaintiff's claims to a jury.'" *Jones v. Bernanke*, 557 F.3d 670, 679 (D.C. Cir. 2009) (second alteration and omission in original) (first citing *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1291 (D.C. Cir. 1998) (en banc); and then quoting *George v. Leavitt*, 407 F.3d 405, 413 (D.C. Cir. 2005)).  Further, "[a] jury may infer discrimination from, among other things, 'evidence of discriminatory statements or attitudes on the part of the employer.'" *Morris*, 825 F.3d at 668 (quoting *Aka*, 156 F.3d at 1289).  As explained below, plaintiff has provided sufficient evidence, highlighting genuine issues of material fact, to defeat defendant's motion for summary judgment on the intentional discrimination claims, but has not provided evidence that would allow a reasonable jury to infer retaliation.

                a)       *Intentional Discrimination Claims (Counts I and III)*

With respect to plaintiff's intentional discrimination claims, genuine issues of material fact exist because, on the record, a reasonable jury could find that discriminatory animus against plaintiff because of her disability was the sole reason that defendant did not hire her as a Bus Scheduling System Specialist and the sole cause of her termination.  The "two essential elements of [an intentional] discrimination claim" under the Rehabilitation Act "are that (i) the plaintiff suffered an adverse employment action (ii) because of the plaintiff's . . . disability." *Baloch*, 550 F.3d at 1196 (citing 29 U.S.C. § 701 *et seq.*).  Being "fired or denied a job or promotion," as plaintiff undisputedly was, are "typical adverse actions in employment discrimination cases." *Id.*

(citing *Brown v. Brody*, 199 F.3d 446, 455–56 (D.C. Cir. 1999)); *see also Adeyemi v. District of Columbia*, 525 F.3d 1222, 1227 (D.C. Cir. 2008) (noting that "not being hired" is "an adverse employment action").  The dispute between the parties thus centers on causation.

Defendant contends that the adverse actions against plaintiff were driven by her "well-documented poor job performance," which "is a nondiscriminatory reason for her non-selection . . . and her termination without any evidence of pretext."  Def.'s Mem. at 11.  In support, it points to plaintiff's negative mid-year and end-of year performance evaluations in 2018, her placement on a PIP, and her failure to successfully complete the PIP.  *Id.* at 10–11; Def.'s Reply at 3.  "[T]he issue" on summary judgment, therefore, "is whether [defendant] *honestly and reasonably believed*" that plaintiff's performance was so inadequate that it warranted a decision against hiring her and her termination.  *DeJesus*, 841 F.3d at 533 (emphasis in original) (quoting *Brady*, 520 F.3d at 496).  Here, plaintiff raises a genuine dispute over defendant's honest belief "by casting doubt on the objective validity of the employer's explanation."  *Morris*, 825 F.3d at 671 (citing *Reeves*, 530 U.S. at 143–46).  Specifically, she has introduced sufficient evidence for a reasonable jury to find that her poor performance record, and Dewey's use of it to recommend plaintiff's non-hiring and termination, resulted from Dewey's discriminatory animus against individuals with disabilities.[4]

First, sufficient evidence has been proffered for a reasonable jury to find that Dewey harbored discriminatory animus against individuals with disabilities.  The best support for Dewey's discriminatory animus comes from the derogatory comments she allegedly made, on

---

[4]       Defendant does not attempt to distance itself from Dewey's actions.  Even if it had done so, "an employer may be held liable for discriminatory acts by a direct supervisor—even where that supervisor is not the final decisionmaker—if '(1) [the] supervisor performs an act motivated by [discriminatory] animus (2) that is *intended* by the supervisor to cause an adverse employment action, and . . . (3) that act is [the] cause of the ultimate employment action.'"  *Morris*, 825 F.3d at 668 (first and second alteration, emphasis, and omission in original) (first quoting *Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011); and then citing *Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 297 & n.1 (D.C. Cir. 2015)).  As the above analysis shows, those criteria exist here.

numerous occasions, about plaintiff's disability and her use of accommodations.  As described *supra* Part I.A.1, plaintiff testified that Dewey was critical of "handicapped" or "sick" persons, and appeared to believe that having a disability was incompatible with performing well at work. Dewey's remarks allegedly were made frequently and sharply enough to reduce plaintiff to tears, were at times made within earshot of plaintiff's coworkers, and eventually were so intimidating to plaintiff that they warranted a mediation.  Such statements, if proven, are "probative evidence of a supervisor's discriminatory attitude . . . when [they] are targeted directly at the plaintiff or [are part] of a pattern of similar remarks."  *Morris*, 825 F.3d at 670.  Dewey's alleged comments, as the key evidence from which a jury might infer discriminatory animus, are thus central to plaintiff's intentional discrimination claims, but a genuine issue of material fact exists as to whether they were actually said.  Dewey herself denies making the comments, *see* Dewey Dep. 82:13-21, and defendant appears to adopt her recollection, *see* Def.'s Reply at 2 ("Dewey denies making any such statements.").  Summary judgment is not appropriate to this "she said, she said" situation, in which "[i]t is the jury's role—not the court's—to determine the weight to give [plaintiff's] recollection in light of evidence casting doubt on its accuracy."  *Morris*, 825 F.3d at 669 (citing *Anderson*, 477 U.S. at 249).

Plaintiff further testified that Dewey prevented her from participating in workplace opportunities and rejected her request to telework, citing plaintiff's use of approved FMLA leave related to her disability in the process.  *See supra* Part I.A.1; Pl.'s Mem. at 6.  Defendant does not explicitly deny either that Dewey took these actions or that her decisions were rooted in plaintiff's use of intermittent leave; defendant stands instead, in the context of assessing plaintiff's hostile work environment claims, on the bare proposition that the activities in which plaintiff sought to engage were "unrelated to her job duties."  Def.'s Mem. at 15.  That fact may

render Dewey's decisions with respect to the activities inactionable standing on their own, but it does not mitigate their potential weight to a jury as evidence of Dewey's bias against plaintiff because of her disability.  Additionally, Dewey issued an Excessive Absences Warning against plaintiff that a reasonable jury could conclude was based at least in part on plaintiff's absences related to her disability, during a period in which she was approved for intermittent FMLA leave as a disability accommodation.  *See* Excessive Absences Warning at 1; Sick Report at 5–7. Altogether, Dewey's comments and actions against plaintiff could lead a reasonable jury to conclude that she held a discriminatory attitude towards individuals with disabilities.

Second, a reasonable jury could find that Dewey's discriminatory animus, not plaintiff's work, was the reason for her negative assessments of plaintiff's performance, resulting in plaintiff's placement on a PIP, and her conclusion that plaintiff did not satisfactorily complete the PIP.  Plaintiff testified that her performance record, the alleged grounds for her non-hiring and termination, was only in question because Dewey created circumstances in which it was impossible for plaintiff to satisfy the objectives ultimately listed as "unmet" in her 2018 evaluation and PIP by removing her access to HASTUS.  Pl.'s Mem. at 7–8, 11; *see also supra* Part I.A.3.  This testimony calls into question whether Dewey honestly believed that plaintiff's performance was subpar and thus whether defendant based its hiring and termination decisions on an objectively valid performance record.  "In an appropriate case, the factfinder's disbelief of the reasons put forward by the defendant will allow it to infer intentional discrimination," particularly where "disbelief is accompanied by a suspicion of mendacity," *DeJesus*, 841 F.3d at 535 (quoting *Aka*, 156 F.3d at 1294), or bolstered by "independent evidence of discriminatory statements or attitudes on the part of the employer," *id.* at 536 (quoting *Aka*, 156 F.3d at 1289). Drawing "all reasonable inferences" in plaintiff's favor, *Wheeler*, 812 F.3d at 1113, then, a

reasonable jury could credit plaintiff's testimony to conclude that Dewey dishonestly distorted plaintiff's performance evaluations and in turn caused plaintiff's non-hiring and termination on false grounds.  That same jury could infer intentional discrimination from its suspicion of Dewey's truthfulness in combination with the evidence of her discriminatory attitude towards individuals with disabilities outlined above.

Defendant highlights evidence contradicting plaintiff's allegation that she was prevented from accessing HASTUS, *see* Def.'s Reply at 3, in particular, the conclusion reached in the resolution of plaintiff's grievance of her 2018 performance evaluation that her "account of instructions given by Dewey [regarding plaintiff's HASTUS access] is inaccurate," Grievance Response at 6; *see* Def.'s Reply at 3.  A reasonable jury could well credit this contradicting evidence and determine that plaintiff in fact had access to all resources needed to successfully complete the performance objectives listed in her 2018 evaluation and PIP.  "On summary judgment, however, [the Court] cannot resolve this credibility contest." *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 578 (D.C. Cir. 2013).  Likewise, that the grievance of plaintiff's 2018 evaluation by her union still resulted in her placement on a PIP, *see supra* Part I.A.3, and that plaintiff had received a warning for inadequate performance in 2013, before Dewey became her supervisor, *see supra* n.2, and a negative mid-year evaluation in February 2018, *see supra* Part I.A.3, may lead a reasonable jury to conclude that Dewey held, and acted upon, sincere and justified concerns about plaintiff's performance.  Nonetheless, "[r]esolving such conflicting inferences is precisely the type of function we leave to the jury, not to a judge ruling on a summary judgment motion." *Morris*, 825 F.3d at 672 (citing *Pardo-Kronemann v. Donovan*, 601 F.3d 599, 605 (D.C. Cir. 2010)).[5]

---

[5]    Plaintiff also contends that "[d]efendant's reason for not hiring [p]laintiff ha[s] changed over time"—namely, that while defendant now points to plaintiff's performance record as explanation, plaintiff "was initially told

Third, plaintiff has supplied enough evidence for a reasonable jury to conclude that she has satisfied the Rehabilitation Act's rigorous causation standard. With respect to the failure to hire claim, viewing the evidence in the light most favorable to plaintiff, prior to Dewey's intervention and the culmination of her PIP with unmet objectives, plaintiff had successfully completed two interviews for the Bus Scheduling System Specialist position. Even after informing the hiring panel that she was in the midst of a PIP, she received a verbal offer for the job. Only after Dewey found plaintiff's progress on the PIP unsatisfactory and brought that fact to the attention of Dunham and Human Resources, allegedly with the intention of preventing plaintiff's transfer, did the trajectory of plaintiff's hiring process change, ending with a meeting in which management made and implemented a rule forbidding the transfer of employees on a PIP that applied only to plaintiff's case. *See supra* Part I.A.4. In combination with plaintiff's evidence that the negative 2018 evaluation and the unsatisfactory conclusion to her PIP may themselves have been caused by discrimination, a reasonable jury could conclude that Dewey's assessment of plaintiff's performance and her decision to intervene in the hiring process, along with defendant's decision to create and apply a policy specific to plaintiff, were driven solely by plaintiff's disability and resulted in her non-selection for the Bus Scheduling System Specialist job. To the extent that defendant's narrative differs from plaintiff's in claiming that the hiring manager for the new position personally concluded that he did not wish to hire an individual with plaintiff's performance record, *see* Def.'s Mem. at 10; Def.'s Reply at 5; Dunham Email at 1, this contradiction presents yet another genuine issue of material fact not fit for resolution at summary judgment.

---

that she was not hired because the position had been eliminated." Pl.'s Mem. at 12. According to plaintiff, this initial explanation "was demonstrably false" because, within days, defendant posted an opening for the same position with the "slightly different title" of Bus Operations Specialist. *Id.* (citing Application Email). This alternative, allegedly pretextual explanation, and the similarities between the position for which plaintiff initially applied and the Bus Operations Specialist role, are further issues of material fact for a jury.

Similarly, a reasonable jury could find that plaintiff was terminated because of her disability. The Termination Letter cites plaintiff's 2018 performance evaluation, her failure to successfully complete the PIP, and her "prior record," (that is, the Excessive Absences Warning and the Safety Violations Warning) as grounds for termination. *See* Termination Letter at 1. A reasonable jury could again conclude in the termination context that Dewey limited plaintiff's access to HASTUS and therefore prevented her from achieving performance objectives, such that Dewey did not hold an honest belief that plaintiff's performance was so inadequate as to warrant termination when she wrote to Human Resources on November 6, 2018 and when she finalized plaintiff's termination on November 28, 2018. She would then have orchestrated plaintiff's termination because of her disability. As to the disciplinary warnings, defendant writes that "[w]hile plaintiff's termination letter references [her] written discipline . . . it is apparent that the sole reason for her termination was her poor job performance and failure to improve during the PIP period." Def.'s Reply at 3. Not only does this shift away from the text of the Termination Letter itself give reason to question defendant's proffered explanations, it also places sole focus on the performance assessments and PIP. Should a jury find that those unfavorable evaluations of plaintiff's performance were the result of discrimination, the unavoidable conclusion would be that plaintiff's termination was likewise discriminatory. Thus, "viewing the evidence in the light most favorable to" plaintiff, *Baylor*, 857 F.3d at 952 (quoting *Wheeler*, 812 F.3d at 1113), with respect to Counts I and III, a reasonable jury could conclude that plaintiff's disability was the but-for cause of her non-hiring and termination. Summary judgment on these counts is therefore denied.

  *b)*  *Retaliation Claims (Counts II and IV)*

In contrast to her intentional discrimination claims, no genuine dispute of material fact exists with respect to plaintiff's retaliation claims because, on the record, no reasonable jury could find that plaintiff was not hired or was terminated solely because she engaged in protected activity.  The Rehabilitation Act, following the ADA, protects individuals from retaliation for "oppos[ing] any act or practice made unlawful," 42 U.S.C. § 12203(a), under section 504, *see* 29 U.S.C. § 794(d).  To succeed on a retaliation claim under the Rehabilitation Act, a plaintiff must show that "(1) she engaged in a protected activity, (2) the defendant took a materially adverse action against her, and (3) there was a causal connection between the protected activity and the adverse action."  *Shinabargar v. Bd. of Trs. of Univ. of D.C.*, 164 F. Supp. 3d 1, 16 (D.D.C. 2016) (quoting *Kimmel v. Gallaudet Univ.*, 639 F. Supp. 2d 34, 43 (D.D.C. 2009)); *see also Minter v. District of Columbia*, 809 F.3d 66, 70 (D.C. Cir. 2015); *Baloch*, 550 F.3d at 1198. Retaliation claims under the Rehabilitation Act "are subject to the same standards as Rehabilitation Act discrimination claims," that is, "to prove the 'causal connection[,]' . . . the plaintiff must show 'that the adverse action would not have occurred but for the protected activity.'"  *Drasek*, 121 F. Supp. 3d at 162 (quoting *Marshall v. Potter*, 634 F. Supp. 2d 66, 73 (D.D.C. 2009)).

"When an employee communicates to her employer a belief that the employer has in engaged in . . . a form of employment discrimination," as plaintiff did by reporting Dewey's alleged comments and conduct towards her in relation to her disability and her use of accommodations, and finally by requesting and attending a mediation with Dewey, "that communication virtually always constitutes the employee's [protected] *opposition* to the activity."  *Crawford v. Metro. Gov't of Nashville & Davidson Cnty.*, 555 U.S. 271, 276 (2009)

(emphasis in original) (internal quotations and citations omitted).[6]  Likewise, plaintiff's non-hiring and termination, as actions "involv[ing] 'a significant change in employment status, such as hiring, firing, [or] failing to promote,'" *Bridgeforth v. Jewell*, 721 F.3d 661, 663 (D.C. Cir. 2013) (quoting *Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003)), "that would have 'dissuaded a reasonable worker from making or supporting a charge of discrimination,'" *Baloch*, 550 F.3d at 1198 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)), qualify as materially adverse actions.  As with plaintiff's intentional discrimination claims, then, the question comes down to causation.

Defendant again cites plaintiff's poor job performance, not her protected activity, as the legitimate, nonretaliatory reason for its decisions not to hire plaintiff as a Bus Scheduling System Specialist and to terminate her employment.  Def.'s Mem. at 11–13.  Plaintiff, however, offers no evidence from which a reasonable jury could infer retaliation.  She appears to rely on the fact that her "very next evaluation" following the March 2018 mediation (the last protected activity she alleges in relation to these claims) "was highly negative, and resulted in her being placed on a PIP," Pl.'s Mem. at 10, which in turn "served as a substantial part of the basis" for her non-hiring and termination, *id.* at 11.  That "very next evaluation," and plaintiff's placement on a PIP, took place in August 2018, five months after the mediation, and the adverse employment actions in which it allegedly resulted took place in November 2018, eight months after the mediation.

---

[6]      In her Amended Complaint, plaintiff alleges that defendant retaliated against her only for initiating and participating in the March 2018 mediation between herself and Dewey, *see* Am. Compl. ¶¶ 77–78, 93–94, but in her summary judgment briefing, plaintiff expands the protected activity for which she allegedly was retaliated against to include the complaints she brought to Human Resources, the Employee Assistance Program, and the Office of Civil Rights in the months preceding her request for mediation, *see* Pl.'s Mem. at 10.  Defendant does not appear to contest this revision, *see* Def.'s Reply at 3–4, and, in any event, the March 2018 mediation is the last instance of protected activity plaintiff alleges.  Notably, plaintiff neither argues in her briefing, *see* Pl.'s Mem. at 9–12; Pl.'s Reply at 1–3, nor alleged in her Amended Complaint, *see* Am. Compl. ¶¶ 76–84, 92–97, that her termination or non-hiring were in retaliation for her use of accommodations, including intermittent leave.  The above analysis therefore does not consider the potential role of that protected activity as a cause of the adverse employment actions taken against plaintiff.

Beyond a threadbare assertion that defendant "displayed a pattern of inappropriate responses" to her protected activity, Pl.'s Mem. at 10; *see supra* n.3, from which "[a] reasonable jury could infer" retaliation, Pl.'s Mem. at 11, Plaintiff does not draw any specific connection between the March 2018 mediation and her firing or defendant's failure to hire her.  She relies instead on the sequence of events, but, standing alone, sequential or "temporal proximity can support an inference of causation 'only where the two events are very close in time.'"  *Congress v. District of Columbia*, 277 F. Supp. 3d 82, 90 (D.D.C. 2017) (quoting *Woodruff v. Peters*, 482 F.3d 521, 529 (D.C. Cir. 2007)).  The eight-month gap between plaintiff's protected activity and the adverse employment actions taken against her, without more, is "too great to suggest a causal link."  *Alston v. District of Columbia*, 770 F. Supp. 2d 289, 301–02 (D.D.C. 2011) (rejecting a causal inference based on temporal proximity where two years elapsed between the protected activity and the adverse employment action); *see also Hamilton v. Geithner*, 666 F.3d 1344, 1357–58 (D.C. Cir. 2012) ("[A] three-month period between the protected activity and the adverse employment action may, standing alone, be too lengthy to raise an inference of causation, [although] neither the Supreme Court nor this court has established a bright-line three-month rule.") (citing *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001)); *Walker v. Mattis*, 319 F. Supp. 3d 267, 272–73 (D.D.C. 2018) (finding that a "seven-month passage of time" between protected activity and adverse employment action "weaken[ed] any inference of but-for causation," *id.* at 272, but was overcome by other evidence of pretext provided by plaintiff).

Nor has plaintiff provided any other evidence linking her protected activity to her non-hiring or her termination.  She claims that her complaints to Human Resources were "dismissed," Pl.'s Mem. at 10, but does not specifically connect that dismissal to her termination or non-

hiring.  Likewise, plaintiff asserts that Dewey "intervened in the hiring process" because of

plaintiff's "complaint" about this supervisor, but provides no support for that theory.  *Id.* at 11;

*see, e.g.*, *Gard*, 752 F. Supp. 2d at 39 (granting employer's motion for summary judgment where

plaintiff "offer[ed] no specific facts to support his burden of persuasion that his engagement in

protected activity was the 'but-for' reason that Defendants refused an official accommodation").

To the contrary, plaintiff testified that Dewey modified her behavior after Human Resources

spoke with her about plaintiff's initial complaints, *see* Hall Dep. 36:3–37:9, and that the March

2018 mediation resulted in "a consensus," *id.* 70:1.  Consequently, on this record, no reasonable

jury could find the necessary causal connection between plaintiff's protected activity and her

non-hiring or termination.  As to Counts II and IV, summary judgment for defendant is granted.

### 3.    *Hostile Work Environment Claims (Counts V and VI)*

Defendant argues that summary judgment as to plaintiff's hostile work environments

claims (Counts V and VI) should be granted in its favor because the alleged harassment to which

plaintiff was subjected was not so "severe or pervasive that it altered the conditions of [her]

employment."  Def.'s Mem. at 13.  The Rehabilitation Act, like the ADA, provides for hostile

work environment claims based on disability.  *See Webster v. U.S. Dep't of Energy*, 443 F. Supp.

3d 67, 81 (D.D.C. 2020); *Aldrich v. Burwell*, 197 F. Supp. 3d 124, 135 (D.D.C. 2016); *Floyd*,

968 F. Supp. 2d at 315 n.4 ("Although this circuit has not resolved the question, four circuits

have found that hostile work environment claims are available under the ADA[.]") (first citing

*Lanman v. Johnson County*, 393 F.3d 1151, 1155 (10th Cir. 2004); then citing *Shaver v. Indep.*

*Stave Co.*, 350 F.3d 716, 719 (8th Cir. 2003); then citing *Flowers v. S. Reg'l Phys. Servs., Inc.*,

247 F.3d 229, 232–35 (5th Cir. 2001); and then citing *Fox v. Gen. Motors Corp.*, 274 F.3d 169,

175–77 (4th Cir. 2001)); *Bonnette v. Shinseki*, 907 F. Supp. 2d 54, 80 (D.D.C. 2012) ("[T]he

D.C. Circuit has been willing to assume that a hostile work environment could be a form of

discrimination under the Rehabilitation Act[.]") (citing *Kuraner v. Mineta*, No. 00-5416, 2001 WL 936369, at *1 (D.C. Cir. July 10, 2001) (per curiam)).

To establish a claim for a discriminatory hostile work environment, "a plaintiff must show that h[er] employer subjected h[er] to 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment'" on the basis of her disability. *Baloch*, 550 F.3d at 1201 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). A hostile work environment "can [also] amount to retaliation" if the employer creates such an environment after an employee engages in protected activity and a causal connection exists between the two. *Baird v. Gotbaum*, 662 F.3d 1246, 1250 (D.C. Cir. 2011) (quoting *Hussain v. Nicholson*, 435 F.3d 359, 366 (D.C. Cir. 2006)). Courts evaluate "'all the circumstances,' including the 'frequency of the [alleged] discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferences with an employee's work performance'" to assess whether a plaintiff's allegations meet the high threshold for making a hostile work environment claim. *Vickers v. Powell*, 493 F.3d 186, 197 (D.C. Cir. 2007) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 787–88 (1998)).

The timeline for harassment in support of a claim of hostile work environment as a form of retaliation "can only plausibly start on the day [plaintiff] first engaged in protected activity." *Aldrich*, 197 F. Supp. 3d at 135. For the purposes of her hostile work environment claims, plaintiff alleges that she "engaged in protected activity via complaints [about Dewey] to Human Resources and her use of leave as an accommodation for her disability." Am. Compl. ¶ 107. Plaintiff's complaints to defendant, as explained above, clearly constitute protected activity, as does her having exercised her right under the Rehabilitation Act to the use of reasonable

accommodations for her disability, *see* 29 U.S.C. § 794(d); 42 U.S.C. § 12203(b).  Her first complaint to Human Resources allegedly occurred in April 2017, at the same time that Dewey became her supervisor and, plaintiff claims, first made derogatory comments to her, so the timelines for her discriminatory and retaliatory hostile work environment claims are essentially the same.

Plaintiff alleges three categories of incidents that make out her hostile work environment claims.  First, both of plaintiff's hostile work environment claims rest primarily on Dewey's alleged derogatory comments, which at times were harsh enough to make plaintiff physically ill and reduce her to tears, and at least twice were said within earshot of plaintiff's coworkers.  *See* Pl.'s Mem. at 13–14; *see also supra* Part I.A.1.  Second, plaintiff alleges that Dewey prevented plaintiff from teleworking, attending an off-site training on time entry, and participating in voluntary opportunities at work, all on the explicit basis of her use of intermittent leave related to her disability.  Pl.'s Mem. at 13, *see also supra* Part I.A.1.[7]  Dewey allegedly denied plaintiff's request to telework publicly enough that her coworkers referred to the rule she designed, barring employees who use more than six days of intermittent FMLA leave from teleworking, as the "Tracy Rule" in conversation.  Pl.'s Mem. at 13, *see also supra* Part I.A.1.  Finally, plaintiff alleges that plaintiff's negative August 2018 performance review and placement on a PIP were part of a hostile work environment Dewey fostered and defendant tolerated.  Am. Compl. ¶¶ 102–104, 109–11; *see also supra* Part I.A.1.[8]

---

[7]    Plaintiff did not allege that this conduct contributed to a hostile work environment in her Amended Complaint, *see* Am. Compl. ¶¶ 98–112; nonetheless, she relies upon it in her summary judgment briefing, *see* Pl.'s Mem. at 12–14, and defendant itself enumerated and responded to these events as bases at least for plaintiff's retaliatory hostile work environment claim, *see* Def.'s Mem. at 13–15.

[8]    Defendant, relying on plaintiff's response to one of its interrogatories during discovery, contends that "[p]laintiff's discriminatory hostile work environment claim rest[s] on a single incident" of Dewey yelling at plaintiff in November 2017.  Def.'s Mem. at 14 (first citing Interrog. Resp. No. 8; and then citing Def.'s Hall Dep. 70:20–71:10).  Both plaintiff's Amended Complaint and her summary judgment briefing paint a broader picture of her claim, as described above, which the analysis that follows adopts.

As explained above, *see supra* Part III.A.2.a, the first and third categories present genuine issues of material fact that cannot be resolved at summary judgment.  The parties openly dispute whether Dewey in fact made the remarks plaintiff recounts.  *See id*.  Likewise, the relationship between plaintiff's performance assessments and her disability or her protected use of accommodations also poses a genuine issue of material fact.[9]  Plaintiff has proffered evidence that she was not able to complete her performance objectives because Dewey, driven by discriminatory animus towards plaintiff and her use of intermittent leave, limited her access to HASTUS, an essential tool, which defendant denies.  *See id*.

Courts in this Circuit "frown[] on plaintiffs who attempt to bootstrap their alleged discrete acts of [discrimination or] retaliation into a broader hostile work environment claim." *Sanders v. Kerry*, 180 F. Supp. 3d 35, 45 (D.D.C. 2016) (alterations in original) (first quoting *Baloch v. Norton*, 517 F. Supp. 2d 345, 364 (D.D.C. 2007), *aff'd sub nom. Baloch v. Kempthorne*, 550 F.3d 1191 (D.C. Cir. 2008); and then citing *Peters v. District of Columbia*, 873 F. Supp. 2d 158, 191 (D.D.C. 2012)).  Although plaintiff also relies on her performance evaluation and PIP and Dewey's comments to support her intentional discrimination and retaliation claims, she makes "additional allegations" in relation to her hostile work environment claims that Dewey denied her permission to telework; refused to allow her to attend off-site training, to volunteer for WMATA's MIP, and to enroll in a sign language class; and removed her from the Family Assistance Team, that, taken together, show that "she has not merely amalgamated her discriminatory and retaliatory acts in circumvention of Circuit precedent."  *Id.*

---

[9]     While plaintiff does not offer evidence linking these events to the March 2018 mediation or the complaints to defendant that preceded it, the only protected activity she alleged in her intentional retaliation claims, *see supra* n.6, she links her retaliatory hostile work environment claim to her use of intermittent leave as a disability accommodation, *see* Am. Compl. ¶ 107.  A reasonable jury could find, based on the record, that the evidence plaintiff has supplied regarding Dewey's comments about plaintiff's use of intermittent leave and her explicit references to plaintiff's attendance in imposing work-related consequences support a retaliatory hostile work environment claim even though plaintiff has not adequately supported her intentional retaliation claims.

at 45.  Some of these allegations, as defendant correctly notes, relate to activities "unrelated to

[plaintiff's] job duties."  Def.'s Mem. at 15.  As such, although they would not support

independent discrimination claims, they are paradigmatic of a hostile work environment claim,

which typically "consists of several individual acts that 'may not be actionable on [their] own'

but become actionable due to their 'cumulative effect.'"  *Baird v. Gotbaum*, 792 F.3d 166, 168

(D.C. Cir. 2015) (alteration in original) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S.

101, 115 (2002)).

A reasonable jury that credits plaintiff's recollection of Dewey's words and her

explanation of the circumstances surrounding her performance evaluations could well find that

the combination of Dewey's frequent and disparaging comments, her interference with plaintiff's

job performance, and her limiting plaintiff's ability to fully participate in workplace trainings and

opportunities as a consequence for her use of intermittent leave, as well as the relatively public

nature of these actions, which resulted in derogatory remarks heard by plaintiffs' coworkers and

references to the "Tracy Rule" among plaintiffs' coworkers, rose to the level of a hostile work

environment.  *See, e.g.*, *Johnson v. Billington*, 404 F. Supp. 2d 157, 170 (D.D.C. 2005) ("If [the

plaintiff] was ostracized at work because of his disability, if he was subjected to daily

disparaging conduct by his supervisors because of his disability, if he was denied basic resources

to do his work because of his disability, and if he was blocked from advancement opportunities

due to disability-based animus, a reasonable jury could conclude that [plaintiff] was subjected to

a hostile work environment so extreme as to alter the terms and conditions of his employment.");

*Pantazes*, 366 F. Supp. 2d at 71 (denying defendant's motion for summary judgment on hostile

work environment claim based on disability where plaintiff "offered evidence of alleged

statements by various agency officials that suggest a discriminatory purpose, unreasonably

length delays by [the agency] in responding to his requests for accommodations, and an

inadequately explained refusal to provide needed . . . training"). Summary judgment as to

Counts V and VI is therefore denied.

### B.   Statutory Notice Claim (Count VII)

Finally, the parties both move for summary judgment as to plaintiff's claim that

defendant failed to provide her with statutory notice of her right to continued group health

coverage after her termination (Count VII), Am. Compl. ¶¶ 113–19. *See* Pl.'s Mot. at 1; Def.'s

Mot at 2. Title XII of the PHSA extends COBRA continuation coverage and notice requirements

to group health plans sponsored by state or local government employers, including "any agency

or instrumentality of . . . a State or political subdivision." 42 U.S.C. § 300bb-1(a). Such plans

must "provide" an option for temporary "continuation coverage" to a "qualified beneficiary who

would lose coverage under the plan as a result of a qualifying event," *id.*, including termination,

*id.* § 300bb-3(2). When a qualifying event occurs, "the employer" who maintains the group

health plan "must notify the plan administrator . . . within 30 days." *Id.* § 300bb-6(2). The plan

administrator, in turn, "shall notify . . . any qualified beneficiary" whose coverage may be

affected by the qualifying event of their right to elect continuation coverage. *Id.* § 300bb-6(4).

Plaintiff argues that no genuine dispute exists as to the fact that she received no such notice

following her November 28, 2018 termination from WMATA and that she is therefore entitled to

summary judgment on this claim. Pl.'s Mem. at 1.

Though the PHSA exempts "any group health plan maintained for employees by the

government of the District of Columbia," *id.* § 300bb-1(b)(2), defendant maintains that it is "a

state agency of Maryland, Virginia and the District of Columbia," Def.'s Mot. at 2, and therefore

does not contest that it is subject to the PHSA's requirements. Nor does defendant contend that

36

plaintiff received the requisite notice of continuation coverage. *See* Def.'s Mem. at 7–9. Instead, defendant argues that it "enjoys the Eleventh Amendment [sovereign] immunity of both Maryland and Virginia as the two state signatories to the WMATA Compact," *id.* at 8 (first citing *Morris v. Wash. Metro. Area Transit Auth.*, 781 F.2d 218, 219 (D.C. Cir. 1986); and then citing *Buck v. Wash. Metro. Area Transit Auth.*, 427 F. Supp. 3d 60, 66 (D.D.C. 2019)), which immunity bars plaintiff's claim and entitles defendant to summary judgment on Count VII, *id.* at 7–9.[10]

This Circuit has repeatedly recognized that defendant "enjoys the Eleventh Amendment immunity" of Maryland and Virginia. *Barbour v. Wash. Metro. Area Transit Auth.*, 374 F.3d 1161, 1163 (D.C. Cir. 2004); *see also, e.g.*, *Beebe v. Wash. Metro. Area Transit Auth.*, 129 F.3d 1283, 1287 (D.C. Cir. 1997) ("In signing the WMATA Compact, [the signatories] conferred upon WMATA their respective sovereign immunities."). Eleventh Amendment sovereign immunity shields the states against "any suit in law or equity," U.S. Const. amend. XI, brought by its own citizens or citizens of another state, *see Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001). The Eleventh Amendment does not, however, bar "[a] federal court . . . from enjoining state officers from acting unconstitutionally." *Vann v. Kempthorne*, 534 F.3d 741, 749 (D.C. Cir. 2008); *see also Ex parte Young*, 209 U.S. 123, 159–60 (1908). Under this rule, known as the *Ex parte Young* exception, suits for equitable relief may be maintained against state officers in their official capacities so long as the "complaint alleges an ongoing violation of

---

[10]     Defendant, in its Amended Answer, raised the affirmative defense that "[p]laintiff's claims are barred, at least in part, by principles of sovereign/governmental immunity." Am. Answer at 6, ECF No. 14. In its motion for summary judgment and briefing, defendant limits its sovereign immunity argument to Count VII. *See* Def.'s Mot. at 2; Def.'s Mem. at 7–9. Even if defendant had contended that sovereign immunity barred plaintiff's Rehabilitation Act claims, that defense would be rejected because the D.C. Circuit has concluded that "WMATA waived its immunity from suit under the Rehabilitation Act by accepting federal transportation funds." *Barbour v. Wash. Metro. Area Transit Auth.*, 374 F.3d 1161, 1170 (D.C. Cir. 2004); *see also* 42 U.S.C. § 2000d-7 ("A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of section 504 of the Rehabilitation Act of 1973[.]").

federal law and seeks relief properly characterized as prospective." *Vann*, 534 F.3d at 750

(quoting *Verizon Md. Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635, 645 (2002)); *see also Dominion*

*Transmission, Inc. v. Summers*, 723 F.3d 238, 243 (D.C. Cir. 2013).

      In an attempt to circumvent defendant's sovereign immunity, plaintiff frames her claim

as an "action[] in equity" that falls within this exception to the Eleventh Amendment.  Pl.'s

Mem. at 14; *see also id.* at 14–15; Pl.'s Reply Supp. Cross Mot. Partial Summ. J. ("Pl.'s Reply")

at 1, ECF No. 20 ("Any monetary or non-monetary relief related to [d]efendant's violation of the

PHSA is equitable in nature and thus does not implicate the Eleventh Amendment.").  Indeed,

her Amended Complaint makes a point of seeking "[a]ppropriate equitable relief . . . including

surcharge, as defined by the Supreme Court in *CIGNA v. Amara*" for Count VII, Am. Compl. at

12, and she argues that defendant should "be ordered to permit [plaintiff's] participation" in the

group health plan, Pl.'s Reply at 2.

      Plaintiff's effort to construe her claim as one for equitable relief fails because she has not

named as a defendant any individual against whom an injunction might properly be entered.

Equitable relief is available only against a state officer, not against a state entity.  *See Kentucky v.*

*Graham*, 473 U.S. 159, 169 n.18 (1985) ("[T]he State's immunity can be overcome by naming

state officials as defendants.") (emphasis omitted) (first citing *Pennhurst State Sch. & Hosp. v.*

*Halderman*, 465 U.S. 89 (1984), and then citing *Ex parte Young*, 209 U.S. 123); *Raj v. La. State*

*Univ.*, 714 F.3d 322, 328 (5th Cir. 2013) ("To fall within the *Ex parte Young* exception to

sovereign immunity, . . . a plaintiff must name individual state officials as defendants in their

official capacities."); *Thompson v. Colorado*, 278 F.3d 1020, 1024–25 (10th Cir. 2001)

("Because no state official has been named as a defendant in this suit, . . . the *Ex parte Young*

exception to Eleventh Amendment immunity is not appropriate."); *Nextel Commc'ns of Mid-Atl.,*

*Inc. v. Town of Hanson*, 311 F. Supp. 2d 142, 163 (D. Mass. 2004) ("A plaintiff cannot claim the benefits of the *Ex parte Young* exception . . . without actually suing the state officers.").  Though plaintiff might have pursued a claim for equitable relief against defendant's officers, defendant is itself immune from such claims under the Eleventh Amendment.  *See Thomas v. Wash. Metro. Area Transit Auth.*, 305 F. Supp. 3d 77, 87 (D.D.C. 2018) (finding "WMATA itself . . . immune" from plaintiff's claim for injunctive relief that would have prospectively awarded him a promotion).[11]

In the alternative, plaintiff argues that "[d]efendant waived its [sovereign] immunity" with respect to PHSA notice claims through its receipt of a letter from CIGNA, defendant's health plan administrator, which made reference to the disclosure and reporting requirements imposed on group health plans through the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*  Pl.'s Mem. at 15; *see also* Pl.'s Mem., Ex. 8, Letter from CIGNA to Carolyn Conquest, WMATA (Jan. 26, 2018) ("CIGNA Letter") at 1, ECF No. 17-9.  A state (or state instrumentality) may waive its sovereign immunity.  *Barbour*, 374 F.3d at 1163 (first citing *Coll. Sav. Bank v. Fla. Prepaid Presecondary Educ. Expense Bd.*, 527 U.S. 666, 670 (1999); and then citing *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 238 (1985)).  To do so,

---

[11]     Nor does plaintiff's reliance on *CIGNA Corp. v. Amara*, 563 U.S. 421 (2011), rescue her surcharge claim. *See* Pl.'s Mem. at 15 n.4; Am. Compl. at 12.  The Supreme Court in that case called a "surcharge" the payment to plan beneficiaries of "money owed them under the plan," *CIGNA Corp.*, 563 U.S. at 441, and observed that "this kind of monetary remedy against a trustee . . . was 'exclusively equitable,'" *id.* at 442 (quoting *Princess Lida of Thurn & Taxis v. Thompson*, 305 U.S. 456, 464 (1939)).  By contrast, here, however, plaintiff seeks monetary relief from a state instrumentality, not a plan trustee, and no money is owed her under the group health plan, nor would continuation coverage have afforded her any right to payment.  Rather, the notice defendant allegedly failed to provide would have informed plaintiff of her right to continue her coverage at cost to her.  Finally, though surcharge may be a form of equitable relief, it is not a form of *prospective* equitable relief to which the *Ex parte Young* exception might have applied, had plaintiff named WMATA officials as defendants, because it necessarily seeks compensation for payments already owed.  *See Edelman v. Jordan*, 415 U.S. 651, 668 (1974) (finding that, although a "retroactive award of monetary relief" may be "a form of 'equitable restitution,' it is in practical effect indistinguishable . . . from an award of damages against the State" and therefore barred by the Eleventh Amendment); *Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 255 (2011) (noting that the *Ex parte Young* exception "does not apply 'when the state is the real, substantial party in interest,'" as when monetary relief from "the public treasury" is sought) (quoting *Pennhurst State Sch. & Hosp.*, 465 U.S. at 101 & n.11).

however, the state must "make a 'clear declaration' of its intent to submit to federal court jurisdiction," *id.* (quoting *Coll. Sav. Bank*, 527 U.S. at 676), through either "the most express language or by such overwhelming implications . . . as [will] leave no room for any other reasonable construction," *Edelman v. Jordan*, 415 U.S. 651, 673 (1974) (alteration in original) (quoting *Murray v. Wilson Distilling Co.*, 213 U.S. 151, 171 (1909)).

As her only evidence of waiver, plaintiff relies on a single sentence in which CIGNA advised defendant that CIGNA would "disclose all information related to the policy and the compensation and fees thereunder that may be requested by the responsible plan fiduciary or plan administrator in order to comply with applicable ERISA disclosure and reporting responsibilities."  CIGNA Letter at 1.  This line reflects a statement made by CIGNA, not defendant, which merely describes CIGNA's obligations under ERISA, a statute that does not apply to defendant' employee benefit plans, with respect to plan-related information.  The letter does not even mention the PHSA or COBRA.  The sentence on which plaintiff relies does not come close to demonstrating that defendant has waived its sovereign immunity with respect to Count VII of her Amended Complaint.  As to Count VII, summary judgment will therefore be granted for defendant.

IV.    **CONCLUSION**

The parties agree that plaintiff has a disability of chronic migraines and thus partial summary judgment as to this finding, which goes to plaintiff's intentional discrimination and hostile work environment claims, is granted.  Defendant's notice of plaintiff's disability is not an element of any of the claims asserted and, consequently, the partial summary judgment plaintiff seeks as to this finding is inappropriate.  Plaintiff has raised genuine issues of material fact that preclude summary judgment to defendant as to her intentional discrimination (Counts I and III)

and hostile work environment (Counts V and VI) claims.  She has not, however, provided sufficient evidence for a reasonable jury to conclude that a causal connection existed between her protected activity and defendant's decisions many months later not to hire her as a Bus Scheduling System Specialist and to terminate her.  Defendant is therefore entitled to summary judgment as to plaintiff's retaliation claims (Counts II and IV).  As to Count VII, plaintiff's claim against defendant, as a state entity, is barred by Eleventh Amendment sovereign immunity, entitling defendant to summary judgment on this claim.  Accordingly, defendant's Motion for Summary Judgment is granted in part and denied in part, and plaintiff's Cross-Motion for Partial Summary Judgment is granted in part and denied in part.

      An Order consistent with this Memorandum Opinion will be entered contemporaneously.

Date: October 2, 2020

_____
BERYL A. HOWELL
Chief Judge